UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

Criminal Action No. 14-20417
Honorable Victoria A. Roberts
Magistrate Judge David R. Grand

v.

D-1    THOMAS MACKEY,
D-2    KENNETH GREEN,
D-3    ALAN CLEMONS,
D-4    JOHN FAYAD,
D-5    DOUGLAS DEMARIA,
D-6    URBAN HOTTS,
D-7    THEODORE LASATER,
D-8    JOSEPH MELCHER,
D-9    DAVID MILAZZO,

        Defendants.
_____/

**REPORT AND RECOMMENDATION TO DENY DEFENDANT KENNETH GREEN'S MOTION TO SUPPRESS ELECTRONIC SURVEILLANCE BECAUSE OF FAILURE TO ESTABLISH AN ADEQUATE SHOWING OF NECESSITY [106]**

## I.    RECOMMENDATION

Before the Court for a Report and Recommendation is Defendant Kenneth Green's Motion to Suppress Electronic Surveillance Because of the Failure to Establish an Adequate Showing of Necessity [106], in which all other Defendants have joined [108, 110, 111, 112, 113, 114, 116, 134]. The government filed a response to the motion on March 12, 2015, and Green filed a reply. [149, 155]. Having reviewed the parties' filings, the Court dispenses with oral argument pursuant to E.D. Mich. LCrR 12.1(a) and E.D. Mich. LR 7.1(f)(2).

For the reasons stated below, the Court recommends that Defendants' motion to suppress [106] be denied.

**II.    REPORT**

    **A.    Background**

In this criminal case, Defendants Thomas Mackey, Kenneth Green, Alan Clemons, John Fayad, Douglas Demaria, Urban Hotts, Theodore Lasater, Joseph Melcher, and David Milazzo were indicted on charges related to their alleged participation in an illegal gambling operation. More specifically, they are charged with violating (1) 18 U.S.C. § 371 – Conspiracy to Commit Offenses Against the United States (to wit, to conduct an illegal gambling business; to engage in the business of betting and wagering and knowingly use a wire communication facility for the transmission in interstate or foreign commerce of bets and wagers and information assisting in the placing of bets and wagers of any sporting contest; and to use the mail or any facility in interstate or foreign commerce to distribute the proceeds of an unlawful activity, in violation of 18 U.S.C. §§ 1955, 1084, and 1952); and (2) 18 U.S.C. § 1955 – Illegal Gambling Business.

Defendants have moved to suppress electronic surveillance which the government obtained pursuant to four Title III wiretap applications – an initial one and three extensions – which were approved by the Honorable Nancy G. Edmunds on September 7, 2012, October 10, 2012, November 8, 2012, and January 29, 2013, respectively.[1]  Federal Bureau of Investigation Special Agent Marc A. Silski submitted each of the applications and accompanying affidavits in support.  The question before this Court is whether Silski's affidavits provided sufficient information to satisfy the "necessity" requirement for approving wiretap applications.[2]

---

[1] Defendants specifically challenge only the initial and first two extensions.  [106 at 1, 13-16]. However, they do argue that "[t]he original and each succeeding Affidavit are inadequate," [*id.* at 18,] and the government has provided the Court with all four affidavits.  Accordingly, the Court will address all four affidavits in this Report and Recommendation.

[2] Defendants do not challenge whether the affidavits in question provided probable cause for the Title III wiretaps, and the Court will not address that issue. [106 at 4].

2

### B. Applicable Law

"Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (the "Act"), has established a comprehensive scheme for the regulation of government electronic surveillance, prohibiting all secret interception of communications except as authorized by the courts in response to applications from law enforcement officials." *United States v. Lambert*, 771 F.2d 83, 90 (6th Cir. 1985). One provision in that Act provides that a wiretap application must contain:

> … a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

18 U.S.C. § 2518(1)(c). While this provision is known as the "necessity" requirement, as the Sixth Circuit has explained,

> … the purpose of the necessity requirement "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques."

*United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000) (quoting *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977)). *See also United States v. Stewart*, 306 F.3d 295, 305 (6th Cir. 2002) ("In endeavoring to secure a wiretap warrant, the government need not prove the impossibility of other means of obtaining information. Instead, the necessity provisions merely require that law enforcement officials 'give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate.'" (quoting *Lambert*, 771 F.2d at 91)). In short, "the court may grant the [Title III application] if it determines [from the affidavit presented to it] that 'normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried

3

or to be too dangerous.'" *Lambert*, 771 F.2d at 91 (quoting 18 U.S.C. § 2518(3)(c)). The provisions do not require a showing that investigators have "exhaust[ed] every conceivable non-wiretap investigative technique." *Id.*[3]

"A wiretap authorization order is presumed proper and the defendants have the burden of overcoming that presumption." *United States v. Darrah*, 2014 WL 5311534, at *2 (E.D. Mich. Oct. 17, 2014). A court reviewing the validity of an electronic surveillance order must accord "great deference" to the issuing judge's determination, and "the fact that a later trial judge or reviewing court may feel that a different conclusion was appropriate does not require, nor even authorize, the suppression of evidence gained through such a warrant." *Corrado*, 227 F.3d at 539 (quoting *United States v. Alfano*, 838 F.2d 158, 162 (6th Cir.1988)).

    C.    Analysis[4]

        i.    **The Initial Application and Affidavit**

The government contends that Silski's initial affidavit "set forth the extent of evidence

---

[3] In light of the Sixth Circuit's clear interpretation of the statutes in question, the Court rejects Defendants' argument that the government must show "exhaustion" of all or any particular investigative procedures before a wiretap application may be approved. [106 at 17].

[4] As a preliminary matter, the Court declines to conduct an evidentiary hearing with respect to the instant motion. Under *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), a defendant is entitled to an evidentiary hearing only if he makes a "substantial preliminary showing" that a "false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *See also United States v. Mastromatteo*, 538 F.3d 535, 545 (6th Cir. 2008) (defendant must "make[ ] a substantial preliminary showing" of false statements in affidavit to warrant holding an evidentiary hearing); *United States v. Abboud*, 438 F.3d 554, 574 (6th Cir. 2006) (the "burden is on the defendant to show such falsehoods in the affidavit"). Defendants' motion makes no such showing, but merely argues that the affidavit in question failed to establish the "necessity" for a wiretap. *See also U.S. v. Watson*, 2011 WL 1565798, at *8 (E.D. Mich. Apr. 25, 2011) (declining to hold a *Franks* hearing on motion to suppress based on alleged failure to show necessity where Defendant had not sufficiently identified intentionally false statements). Thus, the motion poses a strictly legal question that can be resolved by evaluating "the information presented in the four corners of the affidavit[s]." *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006).

collected in the investigation at the time of the application and the reasons why continued use of traditional investigative techniques would likely fail to uncover the true scope of the crime under investigation – a telephonic and internet-based gambling conspiracy." [149 at 10]. The Court concurs with that statement, and finds that Silski's affidavit satisfied the Act's "necessity" requirement.

Silski's affidavit begins by describing the offenses being investigated, including 18 U.S.C. § 1084, which makes it illegal for a person "engaged in the business of betting or wagering" to "knowingly use[] a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest…" 18 U.S.C. § 1084(a); Aff. at ¶3. The affidavit identifies the persons whose communications are being sought, two of whom – Thomas Mackey and Kenneth Green – are defendants in this case. Aff. at ¶¶2-3. The affidavit spends about two pages describing "The Detroit La Cosa Nostra," which information the Defendants argue was improperly included "to create some mystique of dangerousness and divert attention from [Silski's] obligation to overcome the statutory presumption against wiretapping." *Id.* at ¶¶11-13. While the three paragraphs related to the Detroit La Cosa Nostra Family may not contain *the* most germane information in the affidavit, they far from unfairly tainted it. Indeed, one of the affidavit's targets is identified as a member (who holds the rank of capo) of the Detroit La Cosa Nostra Family, Aff. at ¶¶12, 20, and later in the affidavit, Silski avers that "all of the informants [with whom agents spoke] have stated that they are afraid of bodily harm to either themselves or members of their families if their identities are revealed." *Id.* at ¶150; *see also infra* at 8. The affidavit contains other factual references linking the Detroit La Cosa Nostra Family to one of the targets and target offenses. *E.g.*, Aff. at ¶28.

The affidavit then discusses various alternative forms of investigative techniques to wire intercepts. First, the affidavit discusses the information received from four confidential human sources ("CHS"), identified as FBI-1, 2, 3 and 4, and an informant identified by name. Aff. at ¶¶25-69. Generally speaking, the affidavit recounts information provided by the five individuals which link the targets of the investigation to the target offenses. *Id.* FBI-1 reported to Silski that he "witnessed [Defendant] Mackey take bets on [one of the target telephones]," and that even though "most bettors place bets on websites utilized by their bookmaker, [they] still need to telephonically contact bookmakers to either raise their credit limit on the website, or place a bet on a sport they typically do not bet on." *Id.* at ¶41.

Silski's affidavit then described physical surveillance which had taken place, much of which was from a 2007-2010 undercover investigation conducted by the Eastpointe Police Department. *Id.* at ¶¶70-89. The undercover officer ("UCO") reported that Mackey agreed to serve as his bookie, and instructed the UCO as to how bets were to be made. *Id.* at ¶70. Mackey provided the UCO with his own telephone number, as well as two numbers for an associate of his, Ronald Yourofsky, who died two years into the undercover investigation. *Id.* at ¶¶70-74.

Silski's affidavit next described the use of telephone toll and pen register information in the investigation. *Id.* at ¶¶90-122. The information showed numerous calls between the targets of the investigation and the target telephones, and an increase in the volume of those calls around major sporting events. *Id.* at ¶¶90-92, 113-117.

Finally, Silski listed approximately 20 prior authorized wiretaps (including extensions) for many of the same persons who are identified in Special Agent Silski's instant affidavit. *Id.* at ¶¶124-144. Silski averred that monitoring of those wiretaps had ceased as of the date of his affidavit. *Id.* at ¶145.

Silski's affidavit then made a proffer regarding the "unavailability of alternative investigative techniques." *Id.* at ¶¶149-161. It is this section that forms the basis for the bulk of Defendants' arguments, including that: (1) "[m]any of [Silski's] conclusions [regarding unavailability] are not predicated upon specific, documented facts but rather on [his and other unnamed agents'] 'experience' …" and on purported "self-serving prognostication"; (2) Silski "undermines his own claim [by referencing a] lengthy list of potential witnesses" throughout his affidavit; and (3) Silski improperly suggested that undercover operations would not be successful when they previously had been utilized with some success.

The Court will address these arguments in turn, but it should be clear that it does so in light of the binding legal authority and standards described above. *Supra* at 3-4. Thus, the Court's task is not to determine whether Silski's affidavit showed a complete "exhaustion" of all other potential investigative techniques, but rather, whether, giving proper deference to the issuing judge's determination, it is supported by a showing that "the investigators [gave] serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court [was] informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *Lambert*, 771 F.2d at 91.

Turning to Defendants' specific arguments, the Court finds that they lack merit. First, although it is true that Silski relies on his (and his colleagues') "experience" in investigating the types of alleged illegal operations described in his affidavit, *e.g.*, Aff. at ¶¶ 153, his conclusions regarding the unavailability and ineffectiveness of non-wire tap investigation methods are far from conclusory "self-serving prognostications." Rather, Silski supported his conclusions with specific information and details. Silski's discussion of his conclusion that attempting to infiltrate Defendant Mackey's alleged operation would be ineffective is a good example. Far from simply

7

referring to his own general "experience," Silski referenced "the clandestine nature by which the subjects conduct their activities, the close-knit relationship of the participants, and their distrust of strangers." Aff. at ¶153. Silski stated that although the "Detroit Division of the FBI has attempted to infiltrate gambling houses in the Detroit area; this technique will not assist in the infiltration of an illegal sports bookmaking operation, which is usually conducted by telephone and computers." *Id.*[5] And, while Silski stated that the Eastpointe Police Department "had some success placing wagers with Mackey's bookmaking operation," he noted that the undercover operation *failed to uncover the scope* of Mackey's operation." *Id.* (emphasis added). Silski also averred that, "All of the CHS's referred to [in his affidavit] have stated that even if immunized from prosecution and given protective custody, they would be unwilling to testify concerning [the targets and target offenses]. Furthermore, all of the informants have stated that they are afraid of bodily harm to either themselves or members of their families if their identities are revealed." *Id.* at ¶150. The affidavit provides other concrete information that is consistent with the fears expressed by the CHS's; when the UCO reported to Defendant Mackey that he was having difficulty collecting money from another bettor who owed money to Mackey, Mackey asked the UCO, "Why don't you go ball bat him," which Silski interpreted as "encouraging the UCO to engage in an act of violence, or threaten an act of violence, with a baseball bat to obtain the money owed to Mackey…" *Id.* at ¶76.[6] In sum, far from being mere "self-serving

---

[5] The affidavit's multiple references to Mackey and others using the telephone to conduct the gambling operation further underscores the necessity of utilizing a wiretap as part of the investigation. *E.g.*, Aff. at ¶41 (FBI-1 "witnessed Mackey take bets on the telephone…"); *see Landmesser*, 553 F.2d at 20 ("wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation.") (quoting *United States v. Steinberg*, 525 F.2d 1126, 1130 (2d Cir. 1975)).

[6] Defendants' argument that the affidavit's identification of one informant by name "impeaches [Silski's] claims of danger, violence and inability to investigate" is not persuasive. [106 at 9]. The affidavit does not indicate that the named informant knew or considered whether his name

prognostication," Silski's conclusions were supported by specific details and information.

Second, the Court disagrees that by referencing a "lengthy list of potential witnesses" in his affidavit, Silski "undermines his own claim" that "a grand jury could not likely 'unearth' the illegal activities of [the targets]." [106 at 7]. Here, Defendants are referring to Paragraph 158 of Silski's affidavit, which provides:

> The prospects of conducting a successful grand jury investigation at this time, to unearth the illegal activities of the conspirators are poor…at this time, there is not enough evidence in the government's possession concerning the criminal associates of [the targets] and/or the details of their operation for a grand jury investigation [] to be effective. Furthermore, such a grand jury investigation would likely alert the [targets of] this pending investigation and thereby cause them to alter their modus operandi, thereby frustrating the operation.

Aff. at ¶158. Thus, Silski articulated valid reasons why the grand jury could not simply call to testify the various "potential witnesses" referenced by Defendants, and Defendants proffered no information which would show Silski's concerns to be unfounded.[7]

Finally, Defendants' argument that Silski improperly suggested that undercover operations would not be successful when they were utilized previously lacks merit. Silski indicated that investigators had "given thorough consideration to attempting to infiltrate the gambling operation," but concluded that such method was unlikely to succeed. Aff. at ¶153. As

---

would become public. And, even if that one individual did not fear being outed as an informant, that would not disprove that other informants expressed fear and refused to testify.

[7] Silski also proffered that, "Interviews of individuals involved with the illegal gambling activities under investigation would not be feasible at this time, inasmuch as any individual identified (*e.g.*, bettors), would likely fear bodily harm to himself or his family, and would be unlikely to have knowledge of the upper echelon responsible for the operation." *Id.* at ¶159. *See also, id.* at ¶151 ("Interviews with any of the [] subjects or their associates concerning [the alleged criminal activity] would alert the suspects, both known and unknown, of this pending investigation and result in frustration of the instant investigation and possibly the destruction of evidence.").

noted above, *supra* at 7-8, Silski gave detailed reasons supporting his conclusion, and the Defendants have not shown any of those reasons to be pretextual.[8]

The Court also rejects Defendants' reliance on cases like *United States v. Gonzalez*, 412 F.3d 1102 (9th Cir. 2005), and *United States v. Blackmon*, 273 F.3d 1204 (9th Cir. 2001). In *Blackmon*, a government agent submitted a necessity affidavit to conduct electronic surveillance against an initial narcotics trafficking suspect, Maurice Miller. In that affidavit, the agent averred that numerous attempts to use traditional surveillance to investigate Miller had failed. That averment was accurate as to Miller. However, six weeks after obtaining the Miller wiretap, the government submitted a "carbon copy" necessity affidavit against a second target, Rodney Blackmon. *Blackmon*, 273 F.3d at 1208. Thus, the Blackmon affidavit, on its face, raised concerns as to whether the proffered facts supporting the claimed necessity as to him were truthful. Importantly, "no further investigative efforts were attempted in between the application for the Miller wiretap and that for the Blackmon wiretap." *Id.* The Ninth Circuit found that the Blackmon affidavit's reference to failed traditional surveillance techniques as to him were materially false and "worked to conceal the fact that necessity had not been established" as to him. *Id.* The court also found that, removing those false statements, the affidavit was left with only "generalized statements that would be true of any narcotics investigation, [which] fails to contain sufficiently specific facts to satisfy the requirements of § 2518(1)(c)." *Id.* at 1211. Here, in contrast, the Defendants do not point to any materially false statement contained in Silski's

---

[8] Silski's affidavit also discussed the shortcomings of other types of surveillance. For instance, he explained that physical surveillance was successful in neither identifying all of the persons involved in the alleged criminal activity, nor the individuals' specific roles. Aff. at ¶154. He also noted that "Mackey has become surveillance conscious," and that a recent attempt (and more remote ones) yielded "nothing of note to observe … [as] the operation occurs exclusively outside the public view." *Id.* He also explained why GPS trackers and pole cameras would be ineffective. *Id.* at ¶¶155-56.

affidavit, and Silski's detailed explanation as to why other investigative methods were or would be ineffective can hardly be characterized as "generalized statements."

Similarly, in *Gonzalez*, the Ninth Circuit found the wiretap affidavit in question to be invalid because it indicated that the only investigative methods agents had previously attempted were "(1) five-days-worth of pen register analysis; (2) an equally short use of trap-and-trace analysis; and (3) limited physical surveillance," and because other unutilized procedures were reasonably likely to succeed. *Gonzalez*, 412 F.3d at 1112-13. Here, in contrast, Silski showed that agents had attempted an extremely wide array of non-wiretap investigative procedures, and explained their past and likely future shortcomings in terms of aiding the investigation.

For all of these reasons, the Court recommends that, as it relates to Silski's initial application and affidavit, Defendants' motion to suppress be denied.

### ii. The Extension Requests

Defendants also argue that the affidavits Silski used to support his requests to extend the wiretap authorization fail to establish the "necessity" of continued use of wiretaps. But Defendants' argument rests on a series of incorrect premises. First, Defendants' suggestion that the law imposes an exhaustion "reset" requiring the government to show, anew, that all possible other investigative means have been attempted to no avail, is simply an inaccurate statement of the law. Just as no such exhaustion requirement exists with an initial wiretap application, *see supra* at 4, "[a]n application for an extension of a wiretap order requires 'a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results.'" *United States v. Gebara*, 2010 WL 728556, at *4 (E.D. Mich. Feb. 25, 2010) (quoting 18 U.S.C. § 2518(1)(f)).

Second, Defendants' assertion that investigators did not undertake further traditional

investigative techniques after the initial wiretap was authorized is also incorrect. For instance, in Special Agent Silski's first extension affidavit (which, like the other extension requests incorporated his prior affidavits), he explained that, in addition to obtaining wiretap evidence, investigators "attempted several physical surveillances of [] Mackey." 1st Ext. Aff. at ¶90. Silski went on to describe surveillance of Mackey and other individuals driving to meet locations and engaging in apparent brief conversations. *E.g.*, *id.* at ¶93. As Silski explained later in his affidavit, these "observations reveal who is meeting, but not the reason for the meeting, or whether anything is being exchanged at the meeting. It is only through a combination of the interception of wire communications and the surveillance that [agents] were able to learn the nature of the meeting." *Id.* at ¶126; see also 2nd Ext. Aff. at ¶111; 3rd Ext. Aff. at ¶150 ("Since the cessation of interception on December 7, 2012, physical surveillance has been conducted on Mackey on three separate occasions. None of these have yielded any further information indicating where Mackey maintains monies to facilitate the gambling operation…[also since that time] subpoenas have been issued or returns received for subscriber information from service providers. While valuable, subscriber information does not always definitively identify the user of a telephone."). Silski's extension affidavits thus made clear that while agents were continuing to employ non-wiretap investigative methods, "it does not appear that the government could have uncovered the full scope of the conspiracy, especially not in a relatively safe manner, without the wiretaps." *Gebara*, 2010 WL 728556, at *5 (quoting *Stewart*, 306 F.3d at 306). Importantly, the extension affidavits also made clear that the alleged criminal enterprise being investigated continued to rely heavily on the telephone to conduct its affairs. 1st Ext. Aff. at ¶¶58-89; 2nd Ext. Aff. at ¶¶50-75; 3rd Ext. Aff. at ¶¶39-77. Thus, *Landmesser's* reasoning that "wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal

enterprise under investigation" applies as much to Silski's extension affidavits as it did to his initial affidavit. *See Landmesser*, 553 F.2d at 20; *see also supra*, fn. 5.

Defendants also incorrectly claim that Silski failed, in his extension affidavits, to analyze "the abundant amount of evidence and information acquired in the [intervening periods]." [106 at 13]. Defendants claim that in the first thirty days after the initial wiretap was approved, "the identity of numerous bettors was ascertained," and argue that before the government could establish the "necessity" of continuing the wiretap, it was required to either bring "many or all of those bettors, sub books and others" to the grand jury, or send agents to their homes to interview them in person. [*Id.*]. But this argument fails for much the same reason it failed with respect to Silski's initial affidavit; Silski explained the limited information that individual bettors were likely to be able to provide agents about the overall gambling operation, and the risk that approaching any of them would negatively impact the investigation. *See supra* at 9; *see also e.g.*, 1st Ext. Aff. at ¶130. Silski also explained that "there is not enough evidence in the government's possession concerning the criminal associates [] for a grand jury investigation [] to be effective. Furthermore, a grand jury investigation would likely alert the subjects to this pending investigation and thereby cause them to alter their modus operandi, thereby frustrating the investigation." 1st Ext. Aff. at ¶129.

In sum, Defendants' characterization of the extension affidavits as providing "the same boilerplate, hackneyed, unsupported clichés and conclusions" found in his initial affidavit is not a fair description of either the initial or subsequent affidavits' contents. Rather, Silski's initial and extension affidavits show that the government gave "serious consideration to the non-wiretap techniques prior to applying for wiretap authority" and provided the court reasonably detailed information as to why he believed that non-wiretap techniques "have been or will likely

be inadequate.'" *Lambert*, 771 F.2d at 91. Accordingly, Defendants' instant motion to suppress should be denied.

## III. CONCLUSION

For the aforementioned reasons, the Court **RECOMMENDS** that Defendants' Motion to Suppress Electronic Surveillance Because of the Failure to Establish an Adequate Showing of Necessity **[106]** be **DENIED**.

Dated: June 5, 2015  　　　　　　　　　　s/David R. Grand
Ann Arbor, Michigan  　　　　　　　　　　DAVID R. GRAND
　　　　　　　　　　　　　　　　　　　United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record via email addresses the court has on file.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager

Dated:  June 5, 2015